854 A.2d 489

**COMMONWEALTH of Pennsylvania, Appellant**

**v.**

**Dennis FLANAGAN, Appellee.**

Supreme Court of Pennsylvania.

Re-submitted April 30, 2004.

Decided July 23, 2004.

Reargument Denied Sept. 28, 2004.

Karen Ann Diaz, Doylestown, Diane E. Gibbons, Stephen B. Harris, Warrington, for the Com. of PA.

Randall L. Miller, Langhorne, for Dennis Flanagan.

BEFORE: CAPPY, C.J., CASTILLE, NIGRO, NEWMAN, SAYLOR, EAKIN and BAER, JJ.

## OPINION

Justice SAYLOR.

In this appeal, the Commonwealth challenges the Superior Court's conclusion that a post-conviction court properly authorized a withdrawal of guilty pleas grounded on the absence from the plea colloquy of any discussion of the factual basis supporting the pleas.

On July 1, 1981, the victim, James Redman, was robbed, beaten, and killed. Ten days later, police arrested appellee, Dennis Flanagan, and George Yacob, based on an affidavit of probable cause detailing police interviews with persons to whom both Flanagan and Yacob had admitted to having assaulted, robbed, and killed a man, while describing circumstances closely resembling those surrounding Mr. Redman's death. Following their arrest, Flanagan and Yacob provided statements describing their respective roles in the events leading to the murder.

In his statement to police, Flanagan related that he and Yacob planned a non-fatal assault on Mr. Redman on account of Mr. Redman's sexual orientation and his having made advances toward Yacob. Flanagan indicated that he and Yacob arranged to meet with Mr. Redman in his automobile and lured him to a remote industrial park, which Flanagan selected as a suitable location for the beating, under the pretext that Flanagan would have sexual relations with Mr. Redman. According to this account, while the vehicle was parked and Yacob was outside of it, Mr. Redman made an

advance toward Flanagan, who pushed him away, got out of the car, and told Yacob what had happened. The three then drove a short distance and exited the vehicle, with Flanagan pushing Mr. Redman against the car and holding him there (Flanagan purported to having done so defensively, believing that Mr. Redman may have intended to assault him).

Flanagan described the events that followed largely as a series of acts carried out by Yacob, who purportedly: began taunting, hitting, and kicking Mr. Redman; demanded Mr. Redman's wallet and car keys; gave the keys to Flanagan and instructed him to move the vehicle to the front of the industrial park and wait twenty minutes before returning; and, when Flanagan did so and returned, announced that he (Yacob) had dropped a rock on Mr. Redman's head, kicked him in the face, and choked him with a bandana. Flanagan purported to having asked Yacob if they should call an ambulance, and to having inferred from Yacob's response that Mr. Redman was dead or near death. Flanagan also admitted that: he acquiesced in leaving the scene without attempting to personally verify Mr. Redman's condition; personal items of Mr. Redman's were thrown from the vehicle upon leaving the industrial park; he and Yacob drove the automobile around the local area in the days following the killing, then took it on an excursion to the New Jersey shore with several young women; and he and Yacob planned to conceal their crimes by hiding or "dumping" the vehicle.

In his statement to police, Yacob claimed that, on the evening of the killing, he and Flanagan had joined Mr. Redman in his automobile, believing that they would be taken on a trip to obtain and consume illicit drugs. Yacob indicated that Mr. Redman diverted to the industrial park, where he made advances toward Flanagan and, in an ensuing confrontation, approached Yacob with a knife. The purport of Yacob's initial statement was essentially that he had killed Mr. Redman inadvertently and in self-defense, and that Flanagan had not participated or played a significant part in the killing or in the struggle that assertedly had preceded it. At the time of his arrest, Yacob's hands bore impact injuries.

Following a preliminary hearing, charges against Flanagan and Yacob including, *inter alia*, first- and second-degree murder, robbery, and conspiracy were bound over to the common pleas court, and the Commonwealth gave notice of its intention to seek imposition of the death penalty. Flanagan, who was at the time seventeen years old, sought transfer to juvenile court. A series of decertification hearings was convened, during which Flanagan testified, offering a substantially different account of the circumstances of Mr. Redman's killing than he had related in his statement to police. Flanagan's decertification hearing testimony mirrored Yacob's initial statement in the claim that he and Yacob believed that they had joined Mr. Redman for a drug-related excursion, and that Mr. Redman selected the industrial park location at which to stop for reasons that were unknown to Flanagan and Yacob. Flanagan testified that he understood at the time (based on Yacob's assertion) that Mr. Redman had a knife in his possession; he also knew Yacob to carry a knife on occasion.

The remainder of Flanagan's account at the decertification hearing loosely tracked his statement to police. He stated that Mr. Redman made sexual advances; Yacob immediately responded with violence, pulling Mr. Redman from the vehicle and hitting him; a struggle ensued, during which Flanagan pushed Mr. Redman only after Mr. Redman grabbed his leg; as the confrontation between Yacob and Mr. Redman continued, Yacob instructed Flanagan to leave the scene for a period of time; and when Flanagan returned, Yacob was alone and implied that Mr. Redman had been killed. On direct examination, Flanagan testified that he had no prior agreement with Yacob to assault Mr. Redman, but that his frame of mind was that he would defend himself and Yacob if necessary. On cross-examination, however, Flanagan admitted that he and Yacob had made a prior agreement to assault Mr. Redman if sexual advances were made during the trip.[1] Flanagan's prior

1. In contrast to his statement to police, in this version of the events Flanagan was no longer admitting to having agreed with Yacob to deceive Mr. Redman into believing that Flanagan was amenable to having sexual relations with him. Thus, Flanagan newly took the

statement was discussed extensively on direct and cross-examination, and he admitted to having fabricated various portions of it, claiming to have done so because he knew that Yacob had confessed to the killing, and wished to conform his account to Yacob's and/or tell police "what they want[ed] to hear." At the conclusion of the hearings, the common pleas court denied decertification.

A suppression hearing followed, at which the Commonwealth presented testimony from the detectives who signed the affidavit of probable cause, who related, *inter alia*, witness descriptions of inculpatory conversations with Yacob and/or Flanagan in which the participation of both men in the robbery/homicide was described (Flanagan also testified briefly in support of his request for relief). Suppression was denied, and Yacob subsequently pled guilty to first-degree murder and the related offenses, and, as a result of a plea agreement, was sentenced to life-imprisonment.

By this time, the Commonwealth had filed discovery responses containing witness statements including those of a young acquaintance who affirmed that he had overheard Flanagan and Yacob discussing plans to rob and severely beat a man whom they believed to be a homosexual in the days prior to and on the evening of the murder, as well as several persons who attested that Flanagan and Yacob admitted to having beaten and killed a man in a joint physical and verbal assault motivated by discriminatory animus. Among the latter was one of the young women who had traveled to the New Jersey shore with Yacob and Flanagan. She affirmed that Flanagan had admitted to having personally stabbed the victim during the course of the assault, and conveyed that the victim was exposed to a prolonged period of suffering, throughout which he pled for mercy.

Two days later, on the day scheduled for commencement of his trial, Flanagan pled guilty to murder generally, *see* Pa. R.Crim.P. 802 (formerly Rule 352), robbery, and conspiracy to commit murder and robbery. At the plea hearing, Flanagan's

position that an assault on Mr. Redman was neither the planned purpose of the encounter nor a foregone conclusion.

counsel noted that Flanagan had endorsed the information by pleading guilty, and the plea court opened its colloquy by asking Flanagan if he wished to enter guilty pleas to the charges contained in the criminal information, to which Flanagan responded in the affirmative. The plea court then correctly elucidated the various elements of the crimes with which Flanagan had been charged; delineated various defenses; described the presumption of innocence and the burden of proof resting on the Commonwealth in a criminal prosecution; admonished Flanagan that he had a right to a trial by a jury on a unanimous verdict; and specified the applicable ranges of punishment for the offenses that were the subject of the pleas. With respect to the open plea to murder, Flanagan affirmed his understanding that, as a result, it was initially presumed that he was guilty of the lowest degree of murder (third-degree). The plea court also elaborated on third-degree murder and the attendant concept of malice as follows:

Malice, generally speaking means, is said to be a hardness of heart, a mind or a heart that is disregarding his social duty, acting in a way which you know to be contrary to proper acceptable, ethical standards. Malice can mean a direct malice, a hatred of a particular person or it can be manifested generally speaking or indirectly by a generalized hardness of heart, wickedness of disposition.

* * *

Murder of the third degree is an unlawful killing of another person with malice. I've defined malice for you. However, we say that the distinction is that where as first degree murder must be an intentional killing we say that for third degree murder the killing need not be intentional but rather that the intention be to inflict serious or grevious bodily harm upon someone, and if as a result of doing that he dies, that would be third degree murder if in fact the intention was not necessarily to kill but to inflict serious bodily harm. Do you understand that?

MR. FLANAGAN: Yes, sir.

Further, the court explained the purpose and mechanics of a degree-of-guilt hearing, as well as the Commonwealth's bur-

den to prove a higher degree of murder than third-degree, beyond a reasonable doubt.

In connection with Flanagan's plea to conspiracy to commit murder and robbery, the court explained the central concept of an agreement:

> Now, you are pleading guilty to conspiracy to commit robbery and murder.
>
> A conspiracy is committed when any two or more people enter into an agreement to commit a crime if any one of the co-conspirators commits an overt act in furtherance of that agreement. An overt act means any substantial step toward the commission of the crime they have agreed to commit.
>
> Do you understand that?
>
> MR. FLANAGAN: Yes, sir.

Additionally, during the colloquy, Flanagan acknowledged in a generalized fashion that, by entering his pleas, he was admitting to having committed each of the specified crimes. Flanagan also affirmed that he had been afforded sufficient time and opportunity to consult with counsel and his parents, and that he was satisfied with his legal representation.

During the course of the colloquy, however, the plea court committed two errors that are relevant to this appeal. First, it failed to adduce the factual basis for the plea, *see* Pa. R.Crim.P. 590 (comment) (formerly Pa.R.Crim.P. 319); *Commonwealth v. Willis*, 471 Pa. 50, 51–52, 369 A.2d 1189, 1190 (1977) (reflecting the mandatory requirement for a plea court to adduce a factual basis for the plea during a guilty plea colloquy); instead, the court merely alluded to its basic familiarity with the circumstances underlying the plea. The plea court then erroneously advised Flanagan that accomplice theory renders an accomplice liable for "any crimes committed by any other accomplice regardless of whether a particular accomplice committed the particular crime about which we are talking." [2] The court elaborated as follows:

**2.** Culpability of an accomplice is prescribed in Section 306(d) of the Crimes Code, 18 Pa.C.S. § 306(d), as follows:

THE COURT: So that if there are people who are accomplices in the commission of a crime, commission of a murder, commission of a robbery, in a commission of a theft, and if only one of them actually commits the crime but if the other person is his accomplice, he is helping him, he is aiding him, he is assisting him in committing it, then the person who aids and assists and helps and cooperates is equally guilty of the commission of *any crimes* committed by the person he aided.

Do you understand that?

MR. FLANAGAN: Yes, sir.

(emphasis added). Despite the absence of any discussion of the factual basis for the pleas during the plea colloquy, and the plea court's erroneous explanation of accomplice liability, Flanagan's counsel offered no objection, and the court accepted the pleas.

Immediately following the entry of Flanagan's pleas, the common pleas court commenced a degree-of-guilt hearing pertaining to the open plea to murder. The Commonwealth introduced evidence from medical and scientific experts concerning the severity of Mr. Redman's injuries (separated scalp, skull and larynx fractures, cerebral hemorrhaging, contusions to the trunk, and deep penetrating wound to the right-side rib area), the pathological diagnosis of multiple blunt impacts to the head, neck, and trunk; and the substantial likelihood that Mr. Redman endured a prolonged period of suffering. The person who discovered Mr. Redman's body testified to its concealment in a remote location under a substantial pile of debris. A detective testified to the recovery of items of Mr. Redman's personal property from along the roadside leading from the scene of the killing, the discovery of

**(d) Culpability of accomplice.**—When causing a particular result is an element of an offense, an accomplice in the conduct causing such result is an accomplice in the commission of that offense, if he acts with the kind of culpability, if any, with respect to that result that is sufficient for the commission of the offense.

Thus, to be convicted as an accomplice, a person must act with the requisite *mens rea*, for example, in the case of third-degree murder, with malice. The plea court failed to develop this aspect of accomplice liability theory and, indeed, indicated to the contrary in its colloquy.

Mr. Redman's automobile during the interview of a witness to whom Flanagan and/or Yacob related an account of the killing, the gathering of evidence from the vehicle, and the identification of various implements believed to have been used in the killing, including the rock used to smash Mr. Redman's skull. Fingerprints and hairs gathered from Mr. Redman's vehicle were identified as belonging to Flanagan and Yacob. The witness to Flanagan's and Yacob's planning of the robbery/assault testified, indicating that they had discussed with him, *inter alia*, a plan to leave the victim in such a condition as would render him incapable of implicating them; he also stated, *inter alia*, that Yacob showed him a bloody knife the day after the murder. The Commonwealth offered testimony from the female traveling companion who stated that, during the trip to the New Jersey shore, Flanagan boasted that he had beaten, stabbed, and killed a man to obtain the car. She also indicated that Yacob admitted his participation and showed her a knife with a substance on it that appeared to be blood. Further, she reiterated that both Flanagan and Yacob explained that they planned the robbery/homicide because the victim was a homosexual. A prisoner incarcerated with Flanagan testified that Flanagan told him that he had stabbed a man because he did not like his sexual orientation.[3]

Finally, Yacob testified, recanting his earlier statements that Flanagan had not been involved in the murder and explaining that he and Flanagan had devised a plan to kill Mr. Redman and to take his car and money in the weeks preceding the murder. Yacob admitted that Mr. Redman had never had a knife or weapon of any kind. After arriving at the industrial park, Yacob testified, both he and Flanagan participated in prolonged and severe physical and verbal assaults, and while Yacob was choking Mr. Redman, Flanagan took the knife from Yacob's pocket and stabbed Mr. Redman twice. In addition, Yacob stated that Flanagan bludgeoned Mr. Redman's head

3. We note that the credibility of the Commonwealth's witnesses did not go unassailed. For example, on cross-examination Flanagan developed that his traveling companion was under the influence of marijuana throughout the trip to New Jersey, and that the prisoner confidant was a friend of Yacob's.

with the rock, after commenting that it was taking too long for him to die. Yacob admitted that the two used the money stolen from Mr. Redman to buy drugs, alcohol, and gasoline, and confirmed that he, Flanagan, and Mr. Redman had never set out on any trip to obtain illegal drugs, but rather, the encounter resulted from the luring of Mr. Redman to the industrial park to be robbed and killed. The Commonwealth also introduced Flanagan's statement to the police in which he had admitted to a prior agreement with Yacob to assault Mr. Redman, as well as the materially different account that Flanagan related at the decertification hearing.

Flanagan did not present evidence at the degree-of-guilt hearing; however, his counsel contended that the felony-murder rule did not apply as, according to his account, he only developed an intent to rob Mr. Redman subsequent to the murder. Counsel also urged the court to disbelieve Yacob, arguing that the evidence supported a version of the events more in line with Flanagan's accounts, and asked that the court enter a verdict of guilty of third-degree murder. Counsel summarized his argument as follows:

If you believe the testimony of Dennis Flanagan, that his intent on that night was to conspire with George Yacob to go to a place with James Redman and George Yacob, where James Redman would be beaten and that that was the purpose of that conspiracy, that as a result of the beating a murder occurred and that they did not form an intent, that this perpetrator did not form any intent to take a car until after the murder occurred, that the murder did not occur during the perpetration of the underlying felony and, therefore, the felony murder rule would not apply.

This is George Yacob's whole affair; it's not Dennis Flanagan's. . . . [I]t was not his expectation that there would be a killing. It certainly was his expectation that somebody would be beaten, and he plead (sic) guilty to that fact, and the fact that the beating ended up in a death.

The common pleas court, however, rendered a verdict of guilt on the charge of first-degree murder. Flanagan expressed a desire to waive his right to a jury in the penalty

phase, and the court conducted a colloquy, explaining the character of a penalty proceeding in a first-degree murder case, delineating the statutory aggravating and mitigating circumstances, and admonishing that Flanagan had a right to a jury determination and unanimity in the verdict. At the conclusion of the proceeding, the common pleas court found that, although aggravating circumstances were present (killing in the perpetration of a felony, 42 Pa.C.S. § 9711(d)(6)), there were sufficient mitigating factors to outweigh them and thus to prevent the imposition of the death penalty. Accordingly, the court sentenced Flanagan to life imprisonment, with a concurrent term of ten to twenty years' incarceration for the robbery and conspiracy to commit robbery convictions.

After sentencing, Flanagan filed a post-verdict motion, challenging only the common pleas court's refusal to decertify the matter to juvenile court, which was denied. The Superior Court affirmed, and this Court denied allocatur.

In May of 1988, Flanagan filed a *pro se* petition under the former Post Conviction Hearing Act, 42 Pa.C.S. §§ 9541–9551 (superseded) (the "PCHA"). Flanagan contended, *inter alia*, that his guilty plea was unlawfully induced; the plea colloquy was deficient; trial counsel was ineffective for giving inadequate advice and advocating guilty pleas; he was in need of mental health treatment at the time he entered his pleas; he did not participate in Mr. Redman's murder and had no intent to kill; he hit Mr. Redman only in self-defense; he was intoxicated when the crimes occurred; and he wished to call an ambulance after the attack. Although the post-conviction court immediately appointed counsel to assist Flanagan with his petition, the case remained dormant for ten years.

In March of 1999, Flanagan filed a motion for the appointment of new counsel and requested an evidentiary hearing regarding the matters raised in his 1988 petition. He also filed a *pro se* amended petition and an extensive memorandum of law, asserting that the plea court erred in accepting his pleas, and his plea counsel was ineffective for failing to object to the plea colloquy, based on, *inter alia*, the absence of a factual predicate for the pleas and the errors and omissions in

the plea court's descriptions of accomplice and co-conspirator liability, which Flanagan took the position resulted in an unknowing plea. As to his own mindset at the time he entered his pleas, Flanagan offered that he

mistakenly believed, and in part was subsequently instructed, that the loose plan hatched with Yacob (to "beat up" the victim), the failure to stop the beating, and the failure to immediately report the killing rendered him guilty as the killer, George Yacob. Of course, this is a tragic misunderstanding of the law.

Flanagan also asserted that trial counsel was ineffective for failing to present favorable witnesses during the degree-of-guilt hearing, in particular, persons to whom Yacob had related his initial accounts of having himself killed Mr. Redman alone and in Flanagan's absence.

The post-conviction court appointed new counsel and formally allowed the amendment to Flanagan's petition, without objection by the Commonwealth. After several different appointments of counsel, a hearing on the collateral petition occurred in September, 2000. As the trial judge who accepted Flanagan's guilty pleas and presided over the degree of guilt hearing had since retired, a different judge administered in the collateral proceedings.

Flanagan did not testify at the hearing, but presented his mother's account of the events on the day that he entered his guilty pleas. Mrs. Flanagan stated that she and her husband arrived at the courthouse believing that jury selection was to begin. Once they were inside the courtroom, however, Flanagan's attorneys asked them to convince their son that it was in his best interests to plead guilty, due to the nature of the crime and the possibility of a death sentence. She testified that her son expressed an unwillingness to plead guilty during this discussion and indicated that he did not understand why his attorneys wanted him to enter such a plea, because he was not responsible for Mr. Redman's murder.

The Commonwealth presented the testimony of Flanagan's plea counsel, who stated that, given the incriminatory evidence

and particularly heinous circumstances surrounding the killing, Flanagan's best chance of avoiding the death penalty was to enter the open plea, as counsel believed that a jury would return a verdict of first-degree murder. In this regard, counsel explained that, in his experience, the presiding judge had never imposed a sentence of death in any murder case. He also stated that Flanagan had privately admitted to participating in the assault on Mr. Redman and inculpated himself in the murder, and that if Flanagan would have testified, he would have had to have admitted such complicity. Concerning the plea colloquy, counsel was of the opinion that an adequate factual basis for the plea existed on the record, as the evidence adduced at prior proceedings was incorporated into the colloquy by reference. In counsel's view, Flanagan's plea was knowingly, voluntarily, and intelligently entered.

The Commonwealth subsequently filed a motion to dismiss Flanagan's petition, arguing, *inter alia*, that the amended petition was untimely under the one-year filing limitation imposed by the Post Conviction Relief Act, 42 Pa.C.S. §§ 9541–9546 (the "PCRA" or the "Act"). *See* 42 Pa.C.S. § 9545.[4] As to the merits, the Commonwealth contended that Flanagan failed to satisfy his burden, arguing, in particular, that the factual basis for Flanagan's pleas was adduced in detail during the extensive proceedings prior to and immediately after the pleas' entry.

Following oral argument, the PCHA court awarded relief in Flanagan's favor, authorizing the withdrawal of his guilty pleas. The court rejected the Commonwealth's contention that Flanagan's amended petition was time barred, as it did not constitute original process, but rather, represented a valid amendment to an already-filed, timely petition. Substantively,

4. The 1995 amendments to the PCRA were enacted on November 17, 1995, and became effective 60 days after the amendments were promulgated. The amendments provided that a petitioner whose judgment became final before the effective date of the amendments would be deemed to have filed a timely petition under the Act only if the petitioner's first petition was filed within one year of the amendments' effective date. *See* Section 3(1) of the Act (Spec. Sess. No. 1), Nov. 17, 1995, P.L. 1118, No. 32.

the PCHA court concluded that Flanagan's ineffectiveness claim was of arguable merit, as the plea colloquy did not provide a sufficient factual basis for the involved crimes, thus rendering the pleas unknowing. In particular, the PCHA court found that, while the plea court explained the elements of the crimes with which Flanagan had been charged, it never established that Flanagan admitted to having murdered Mr. Redman, nor did it attempt to relate the elements of the offenses to the admitted facts, which was particularly essential since Flanagan had offered an exculpatory explanation prior to the entry of the pleas. The court further noted that, at the time that he entered his pleas, Flanagan was unaware of much of the Commonwealth's evidence, and, in particular, Yacob's revised account of the murder.

In addition, the PCHA court found plea counsel's testimony unpersuasive, observing, among other things, that counsel's recollection was murky at best. The court specifically rejected plea counsel's testimony that Flanagan had inculpated himself personally in the attack on Mr. Redman, since it found nothing in the record that would so indicate, and Flanagan had previously testified to the contrary under oath at the decertification hearing. In this regard, the court concluded that counsel did not accurately recall the facts, since, if they were as he indicated, he would have knowingly permitted Flanagan to perjure himself at the decertification hearing. In addition, the PCHA court found counsel's contention that he believed that it was in Flanagan's best interests to plead guilty to avoid the death penalty flawed, as Flanagan faced the same possibility of the receiving a death sentence after pleading guilty that he did prior to the entry of his plea.

The PCHA court concluded:

The Commonwealth suggests that it would be disingenuous and contrary to the fundamental concepts of constitutional law to apply the standards for a guilty plea in a "hyper-technical fashion." It is our belief that there is no greater need for technical adherence to the laws of state and country than when a decision to forego one's constitutionally guaranteed rights is at stake. As stated by the United

States Supreme Court in *Boykin[ v. Alabama*, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969)], "What is at stake for an accused facing death or imprisonment demands the utmost solicitude of which courts are capable in canvassing the matter with the accused to make sure he has a full understanding of what the plea connoted and of its consequence." Assuring that a defendant has the information necessary to make an intelligent and informed decision on how to plead is the minimum required of the constitution and is not, as the Commonwealth insists, a perverted application of the law.

(citations omitted).

The Superior Court affirmed in a memorandum opinion, on reasoning similar to the PCHA court's. It emphasized, in particular, that the Commonwealth lacked authority for its assertion that evidence adduced at a degree-of-guilt hearing could cure a preceding, inadequate guilty plea colloquy. The Superior Court summarized its finding of prejudice as follows:

The trial judge did not have Flanagan's open admission of the facts and actions which constituted the crime, and therefore no clear understanding as to what he was pleading guilty (sic). There is no indication in the record that Flanagan at any time was aware that he would be accused of conspiring to kill the victim; that he would be accused of stabbing and bludgeoning the victim; or that he would ever be accused of even touching the victim. The record as established in the PCHA court indicates that Flanagan apparently felt that he was guilty as an accomplice, and always maintained that he never touched the victim, and only agree to beat the victim, never to kill him.

Presently, the Commonwealth maintains that judicial review of Flanagan's amended petition is time barred. On the merits, the Commonwealth argues that the Superior Court and the PCHA court erroneously reviewed the record to determine whether a factual basis existed at the time of the plea to support a first-degree murder conviction; however, an open plea to murder is tantamount only to an admission to third-

degree murder.[5]   Thus, according to the Commonwealth, it need only establish that the record reflects a factual basis for third-degree murder, which does not require a specific intent to kill, but rather, attaches to the broader culpability conception of malice, as was explained by the plea court. In this regard, the Commonwealth emphasizes that it would be absurd to require a defendant entering an open plea to murder to admit to having had specific intent to kill, as the defendant will put the Commonwealth to its proofs in this regard at a degree-of-guilt hearing.   The Commonwealth contends that the record of the proceedings before and immediately after the plea hearing amply establishes the predicate for third-degree murder—malice; Flanagan was well aware of the charges against him and the character of the Commonwealth's evidence; [6] and the guilty plea colloquy between the plea court and Flanagan was otherwise thorough and comprehensive. Indeed, the Commonwealth stresses that the evidence considered in the totality overwhelmingly established that Flanagan and Yacob jointly committed a brutal, premeditated robbery/murder based, in large part, on personal prejudices.

**5.** Parenthetically, in Pennsylvania, the defendant retains the ability to rebut this presumption at the degree-of-guilt hearing to mitigate the offense to voluntary manslaughter. *See generally Commonwealth v. Mitchell,* 528 Pa. 546, 599 A.2d 624 (1991); *Commonwealth v. Myers,* 481 Pa. 217, 392 A.2d 685 (1978).

**6.** In this regard, the Commonwealth notes:

Appellee was arrested, charged and preliminarily arraigned on the charge of First Degree Murder for the murder of James Redman, Robbery and related charges, and Criminal Conspiracy with George Yacob. Appellee gave a taped statement to the police when interviewed about his involvement in the murder of James Redman. Appellee had a preliminary hearing on these charges, all of which were bound over for trial. Thereafter, Appellee was arraigned in open court on these charges. Appellee was aware that the Commonwealth was seeking the death penalty. Appellee petitioned the Trial Court to transfer his case to Juvenile Court, testified at the transfer hearing, and was questioned as to his involvement in James Redman's murder. Appellee moved to suppress certain evidence, and again testified at the pre-trial hearing. During that testimony, Appellee acknowledged that he knew he was charged with the beating death and murder of James Redman, that he knew he was charged together with George Yacob in this murder, and that he was aware of the facts and allegations in this case.

Additionally, the Commonwealth relies on plea counsel's testimony from the post-conviction proceedings concerning the rationale underlying the plea. Finally, the Commonwealth stresses that Flanagan did not testify at the PCHA hearing or present evidence relating to his claim that he did not apprehend the factual basis underlying his pleas, or that the pleas were not knowingly, voluntarily, and intelligently entered.

In his brief, Flanagan maintains that the defects in the plea colloquy not only rendered his pleas unknowing, but also contributed to his entering guilty pleas to crimes of which he was innocent. Again, he indicates that he mistakenly believed, and, by virtue of the plea court's erroneous description of accomplice liability, was in fact instructed, "that the loose plan hatched with Yacob (to 'beat up' the victim), the failure to stop the beating, and the failure to immediately report the killing rendered him guilty as the killer, George Yacob." Further, Flanagan highlights that at no time prior to the degree-of-guilt hearing did the Commonwealth produce any evidence in his presence running contrary to his statements concerning the degree of his involvement in Mr. Redman's murder. In the absence of such direct confrontation and/or factual development at the plea colloquy at least on the order of an inquiry into whether or not he killed or helped to kill Mr. Redman, and in the face of the purportedly exculpatory explanations that he had provided to police and to the court at the decertification hearing, Flanagan contends that his pleas cannot be sustained on this record. In this regard, he cites, in particular, *Commonwealth v. Hines,* 496 Pa. 555, 437 A.2d 1180 (1981), in which this Court afforded relief from a plea-based conviction grounded on the plea court's acceptance of the plea without a threshold inquiry as to the underlying factual basis. Flanagan concludes that the circumstances surrounding his pleas evidence manifest injustice.

Preliminarily, we agree with the Superior Court that the PCHA court properly declined to treat Flanagan's amended petition as a serial, post-conviction petition which would be independently subject to the PCRA's one-year time limitation. *Accord Commonwealth v. Williams,* 573 Pa. 613, 628–30, 828

A.2d 981. 573 Pa. 613, 828 A.2d 981, 990–91 (2003).[7] PCRA courts are invested with discretion to permit the amendment of a pending, timely-filed post-conviction petition, and this Court has not endorsed the Commonwealth's position that the content of amendments must substantively align with the initial filing. *Accord id.* Rather, the prevailing rule remains simply that amendment is to be freely allowed to achieve substantial justice. *See* Pa.R.Crim.P. 905(A). The Court has recognized that adherence to such rules governing post-conviction procedure is particularly appropriate since, in view of the PCRA's time limitations, the pending PCRA proceeding will most likely comprise the petitioner's sole opportunity to pursue collateral relief in state court. *See generally Commonwealth v. Williams,* 566 Pa. 553, 565, 782 A.2d 517, 524 (2001).

■ On the merits we have noted that the colloquy supporting Flanagan's pleas was defective, by reason of both an absence of a contemporaneous record of the factual basis for the plea and the erroneous accomplice liability instruction.

The factual basis requisite is among six elements, which, as Flanagan notes, this Court has maintained are essential to a valid plea colloquy. *See* Pa.R.Crim.P. 590(A)(2) (comment);[8] *see also Hines,* 496 Pa. at 564, 437 A.2d at 1184. The salutary purposes of the requirement include protecting against the situation that Flanagan claims has occurred here, namely, a defendant's mistaken plea to an offense that is not actually implicated by his conduct. *See generally* 21 AM.JUR.2D *Crimi-*

---

7. This matter is factually distinguishable from the Court's recent decision in *Commonwealth v. Rienzi,* 573 Pa. 503, 827 A.2d 369 (2003), in which the Court found a second petition for collateral relief to be untimely. In *Rienzi,* the first petition for collateral relief had been withdrawn prior to the filing of the second, and thus, there was nothing pending before the PCRA court that the petitioner could amend. Here, as noted, Flanagan's original petition for collateral relief was never withdrawn or dismissed.

8. As noted in the rules' commentary, the plea court must also ascertain whether the defendant understands the nature of the charges to which he or she is pleading guilty, that he or she has a right to a trial by jury, that he or she is innocent until proven guilty, the permissible range of sentences and/or the fines for the offenses charged, and that the court is not bound by the terms of any plea agreement unless it accepts the agreement.

*nal Law* § 714 (2003). As the PCHA court emphasized, compliance with the rule also facilitates appellate review and conserves judicial resources. *See Boykin*, 395 U.S. at 244, 89 S.Ct. at 1712–13 ("When the judge discharges [his] function [at a plea colloquy], he leaves a record adequate for any review that may be later sought, and forestalls the spin-off of collateral proceedings that seek to probe murky memories." (citations and footnotes omitted)); *Commonwealth v. Dilbeck*, 466 Pa. 543, 547, 353 A.2d 824, 827 (1976). *See generally* A.B.A. STANDARDS FOR CRIMINAL JUSTICE, PLEAS OF GUILTY § 14–1.6(a) (2d ed. 1980 & Supp. 1986).

Although this Court has stressed its strong preference for a dialogue in colloquies with meaningful participation by the defendant throughout, there is no set manner, and no fixed terms, by which factual basis must be adduced. *See, e.g., Commonwealth v. Nelson*, 455 Pa. 461, 464, 317 A.2d 228, 229 (1974) (cognizing, as a sufficient factual basis, an on-the-record summary of the Commonwealth's evidence by the district attorney, which followed the plea court's acceptance of the plea). Moreover, while the Court has admonished that a complete failure to inquire into any one of the six, mandatory subjects generally requires reversal, *see, e.g., Commonwealth v. Chumley*, 482 Pa. 626, 634, 394 A.2d 497, 501 (1978); *Willis*, 471 Pa. at 52, 369 A.2d at 1190; *see generally Commonwealth v. Ingram*, 455 Pa. 198, 203–05, 316 A.2d 77, 80–81 (1974) (holding that the character of a guilty plea is tested according to the adequacy of the on-the-record colloquy), as both parties acknowledge, in determining the availability of a remedy in the event of a deficient colloquy, it has in more recent cases moved to a more general assessment of the knowing, voluntary, and intelligent character of the plea, considered on the totality of the circumstances. *See, e.g., Commonwealth v. Allen*, 557 Pa. 135, 146, 732 A.2d 582, 588–89 (1999); *Commonwealth v. Schultz*, 505 Pa. 188, 192, 477 A.2d 1328, 1330 (1984); *Commonwealth v. Shaffer*, 498 Pa. 342, 350–51, 446 A.2d 591, 595–96 (1982); *cf. Commonwealth v. Martinez*, 499 Pa. 417, 422, 453 A.2d 940, 943 (1982) ("In a case where ample, competent evidence in support of a guilty plea is made a matter of record, allegations of manifest injustice arising from

the guilty plea must go beyond a mere claim of lack of technical recitation of the legal elements of the crimes.").

The Commonwealth and the dissent amplify a number of valid reasons why the common pleas court's error in failing to adduce the factual basis for the plea, viewed in isolation, might not require the invalidation of Flanagan's plea. However, upon consideration of the totality of the circumstances, it is apparent that the common pleas court did not err in affording relief, just as the Superior Court did not err in sustaining it.

As noted, in explaining to Flanagan the legal principles governing his acceptance of criminal liability, the plea court made a materially erroneous statement of controlling law to the effect that a defendant's status as an accomplice gives rise to vicarious criminal liability for "any crimes" of the principal. In substantial contrast to this plea-affirmation, however, the culpability of an accomplice is prescribed in Section 306(d) of the Crimes Code, as follows:

> **(d) Culpability of accomplice.**—When causing a particular result is an element of an offense, an accomplice in the conduct causing such result is an accomplice in the commission of that offense, *if he acts with the kind of culpability, if any, with respect to that result that is sufficient for the commission of the offense.*

18 Pa.C.S. § 306(d) (emphasis added); *see also* 18 Pa.C.S. § 305 (defining an accomplice according to his intent in relation to the crime with which he is charged as an accomplice).[9] Thus, to be convicted as an accomplice, a person must act with the requisite *mens rea,* for example, in the case of third-degree murder, with malice. *See, e.g., Commonwealth v. Gooding,* 818 A.2d 546, 550–51 (Pa.Super.), *appeal denied,* 575 Pa. 691, 835 A.2d 709 (2003).[10] The plea court failed to

**9.** Sections 305 and 306 were enacted in 1972 (eight years prior to Flanagan's trial), and are drawn directly from the Model Penal Code, which eschews the form of strict liability for any crimes of an accomplice affirmed by Flanagan in the plea colloquy in this case. The dissent's contention Pennsylvania law was ever unclear in this regard is unsupported by any of the cases to which it cites generally.

**10.** The *Gooding* case also cites the approved explanation of accomplice liability as follows:

develop this central aspect of accomplice liability theory and, indeed, caused Flanagan to affirm that his understanding of the controlling law was exactly to the contrary.[11]

This Court has maintained that the entry of a plea that is unknowing, in the sense that the defendant lacks a basic understanding of the legal principles giving rise to the criminal responsibility that he is accepting, is a manifest injustice and grounds for post-conviction relief. *See, e.g., Commonwealth v. Gunter*, 565 Pa. 79, 84, 771 A.2d 767, 771 (2001) (plurality, but with all Justices agreeing that a manifest injustice is established in circumstances in which a plea is unknowing).[12] The standard for post-sentence withdrawal of guilty pleas dovetails with the arguable merit/prejudice requirements for relief based on a claim of ineffective assistance of plea counsel, *see generally Commonwealth v. Kimball*, 555 Pa. 299, 312, 724 A.2d 326, 333 (1999), under which the defendant must show that counsel's deficient stewardship re-

A person does not become an accomplice merely by being present at the scene or knowing about a crime. He is an accomplice, if with the intent of promoting or facilitating the commission of *that crime*, he solicits, commands, encourages, or requests the other person to commit it or aids, agrees to aid, or attempts to aid the other person in planning or committing it.

*Gooding*, 818 A.2d at 550 (emphasis added).

11. The Washington courts have dealt extensively with this sort of error in the context of defective jury instructions. *See, e.g., State v. Roberts*, 142 Wash.2d 471, 14 P.3d 713, 736 (2000) (stating that knowledge by the accomplice that the principal intends to commit 'a crime' does not impose strict liability for any and all offenses that follow); *State v. DeGruy*, No. 43336-9-I, 116 Wash.App. 1023, 2003 WL 1743098, at *2 (Wash.Ct.App. March 31, 2003) (memorandum) (The error in [the defendant's] accomplice instruction requires reversal when 'evidence of an uncharged crime is before the jury, and the State argues that the defendant's participation in any crime triggered liability for the specific crime charged.' (citations omitted)).

12. Indeed, at the time Flanagan entered his plea, the Court vigorously applied a *per se* rule in this regard. *See, e.g., Commonwealth v. Kulp*, 476 Pa. 358, 363, 382 A.2d 1209, 1212 (1978) (refusing to remand, following a finding of a materially defective plea colloquy, for a hearing on the state of the defendant's actual knowledge and stating: For pleas entered after our decision in *Ingram*, there can be no excuse for a hearing court to have failed to recognize the need of an adequate *on-the-record* colloquy reflecting a knowledgeable and intelligent waiver. (emphasis in original)).

sulted in a manifest injustice, for example, by facilitating entry of an unknowing, involuntary, or unintelligent plea. *See, e.g., Allen,* 557 Pa. at 144, 732 A.2d at 587 ("Allegations of ineffectiveness in connection with the entry of a guilty plea will serve as a basis for relief only if the ineffectiveness caused appellant to enter an involuntary or unknowing plea."); *Commonwealth v. Frometa,* 520 Pa. 552, 555, 555 A.2d 92, 93 (1989); *see also Commonwealth v. Flood,* 426 Pa.Super. 555, 567, 627 A.2d 1193, 1199 (1993). In terms of the other requirement for relief based on ineffectiveness, lack of reasonable basis, *see Kimball,* 555 Pa. at 312, 724 A.2d at 333, there is no reason that we can conceive of which would justify plea counsel's acquiescence in the patently defective colloquy under review in this case. Moreover, the PCHA court made an express credibility finding rejecting plea counsel's proffered excuse for not insisting on an adequate colloquy.

Indeed, it is difficult to hypothesize a more concrete example of a facially defective colloquy, and correspondingly legally unknowing plea, than a circumstance in which the plea court causes the defendant to affirm a materially erroneous understanding of the substantive law establishing criminal liability on the offenses charged. *Accord Boykin,* 395 U.S. at 243 n. 5, 89 S.Ct. at 1712 n. 5 (" '[B]ecause a guilty plea is an admission of all the elements of a formal criminal charge, it cannot be truly voluntary unless the defendant possesses an understanding of the law in relation to the facts.' " (citation omitted)). By supplying the wrong legal framework against which to assess the facts, the plea court exacerbated the effect of the substantial deficiency arising out of its failure to adduce the factual basis and rendered the plea unknowing on the face of the record presented.

The dissent apparently views the issue concerning Flanagan's on-the-record affirmation of a materially erroneous understanding of applicable law as entirely distinct from the plea's other substantial deficiency, namely, the absence of any discussion of the factual basis for the plea, and irrelevant to the essential totality assessment. Thus, the dissent would relegate the former issue to consideration on remand in the

PCHA court. We differ, however, with this approach, for several reasons.

First, as previously noted, a totality assessment of the knowing, voluntary, and intelligent character of a plea cannot be fairly undertaken without accounting for the plea court's explanation of the relevant law. The dissent apparently acknowledges the United States Supreme Court's admonition that, for a defendant to understand the charges against him he must have an understanding of the law in relation to the facts, see *Boykin*, 395 U.S. at 243 n. 5, 89 S.Ct. at 1712 n. 5, but would afford it no effect.

Second, the close interrelationship between the two material defects in the plea under review is apparent on the face of the record. The colloquy concerning both accomplice liability and the attendant facts was central to this case, in particular, because another defendant, Yacob, participated in (and indeed had pled guilty to) the crimes, and Flanagan claimed on the record (at a decertification hearing) to have been absent during the actual killing and described his intent in a manner that facially could implicate a lesser culpable state.[13] Indeed, from the outset of the colloquy, the plea court stressed the centrality of accomplice liability theory to Flanagan's acceptance of criminal liability, as follows:

THE COURT: So in order to begin and in view of the fact that both you and Mr. Yacob are jointly involved or at least jointly charged with these various crimes, let me begin by explaining to you the law of accomplice, because that will sort of tie things together here, I think, and make it easier

**13.** On review of the record, we note, however, that even if a fact-finder were to accept Flanagan's most favorable version of the facts, it would nevertheless be free to find that he acted with malice and therefore was, at a minimum, an accomplice to third-degree murder. Moreover, the plea court conducted a degree-of-guilt hearing, at which Flanagan was found guilty of first-degree murder beyond a reasonable doubt. These observations, however, do not cure the plea court's defective explanation of accomplice liability, as a jury could also rely on Flanagan's most favorable version to infer a lesser degree of culpability; Flanagan waived his right to a jury trial having affirmed on the record a materially erroneous statement of relevant law; and the inquiry relevant to the validity of the plea centers on its knowing and voluntary character.

for you to understand how these charges came about. Okay?

[FLANAGAN]: Yes, sir.

Third, the factual basis requirement exists precisely to protect against a mistaken plea to an offense that is not actually implicated by the defendant's conduct. *See generally* 21 AM.JUR.2D *Criminal Law* § 714; A.B.A. STANDARDS FOR CRIMINAL JUSTICE, PLEAS OF GUILTY § 14–1.6(a). The requirement, therefore, is designed to counterbalance any material misunderstanding of the law on the part of the defendant, which is, in the present case, a matter of record as a result of the plea court's defective explanation of accomplice liability.[14]

Fourth, even if the plea court's defective explanation of controlling law were not subsumed within the totality assessment, this Court has the ability to affirm a valid judgment or order for any reason appearing as of record.[15] There is good cause for invoking such authority here, since the decision to remand a case in which the colloquy is marred by facial error so apparent from the record and dispositive in terms of plea-invalidity represents an inefficient utilization of judicial resources.[16]

We therefore hold that a review of the totality of the circumstances establishes that Flanagan's plea was of an unknowing character and, for this reason, will not disturb the disposition of the Superior Court and PCHA court. On a

**14.** Flanagan references the matter precisely on these terms in his brief. *See* Brief of Appellee at 18 (noting that the plea court's deficient colloquy as concerns accomplice liability exacerbated the impact of its failure to adduce a factual basis).

**15.** *See generally Commonwealth v. Katze,* 540 Pa. 416, 425, 658 A.2d 345, 349 (1995) (opinion divided on other grounds); *McAdoo Borough v. Commonwealth, Pa. Labor Relations Bd.,* 506 Pa. 422, 428–29 n. 5, 485 A.2d 761, 764 n. 5 (1984); *E.J. McAleer & Co. v. Iceland Prods., Inc.,* 475 Pa. 610, 613 n. 4, 381 A.2d 441, 443 n. 4 (1977); *Hader v. Coplay Cement Mfg. Co.,* 410 Pa. 139, 145–46, 189 A.2d 271, 274–75 (1963); *Sherwood v. Elgart,* 383 Pa. 110, 115, 117 A.2d 899, 901–02 (1955).

**16.** The systemic problem manifested in this case, which languished in the PCHA court for approximately a decade, also does not go without notice.

closing note, we reinforce our expectation of compliance with the six, straightforward and relatively modest requirements that set the baseline for a valid guilty plea colloquy. *See* Pa.R.Crim.P. 590 (comment).

The Superior Court's order is affirmed, and the matter is remanded for trial.

Justice CASTILLE files a dissenting opinion in which Chief Justice CAPPY and Justice EAKIN join.

Justice CASTILLE dissenting.

This Court granted discretionary review to consider the award of Post Conviction Hearing Act (PCHA)[1] relief to appellee Dennis Flanagan. The PCHA court in this matter overturned appellee's first degree murder verdict and permitted him to withdraw his 1981 general plea of guilty to charges of murder, robbery and conspiracy. The court concluded that appellee's guilty plea was entered unknowingly because the plea colloquy failed to establish an adequate factual basis for the plea. The Superior Court affirmed. For the reasons that follow, I would reverse.

The relevant facts are as follows: on July 1, 1981, the seventeen year-old appellee and his nineteen year-old accomplice, George Yacob, lured James Redman to a deserted industrial park in Bucks County, where he was robbed and beaten to death. Days later, Redman's decomposing body was found hidden in a wooded area behind the industrial park, beaten beyond recognition; his skull was fractured in four places, his larynx was broken, and he had been stabbed at least once.

On July 10, 1981, police arrested appellee and Yacob. Appellee admitted in a taped statement that he and Yacob had planned to bring Redman to a secluded area and "beat him up" because they believed he was a homosexual. Flanagan

---

1. The PCHA was repealed in part, modified in part, and renamed the Post Conviction Relief Act (PCRA), effective April 13, 1988. Appellee filed his initial PCHA petition shortly before the 1988 amendment. The claim upon which relief was granted was added in an amended PCHA petition filed eleven years later.

Statement, 7/10/81 at 2. As appellee explained, "George had told me that this guy had picked him up before, and he tried making certain advances on George. So me and George had figured we were gonna get together and work this guy over a little bit to change his mind a bit." *Id.* Appellee told police that they had promised Redman that appellee "would do it with him" if Redman drove appellee and Yacob to a secluded area. *Id.* Redman then drove them to the deserted industrial park where, according to appellee, Yacob grabbed Redman, hit him, knocked him down and then kicked him. Appellee recalled that when Redman got back up, "we just sort of started talking and telling him we were gonna beat his ass and this, that and the other thing." *Id.* at 4.

Appellee maintained, however, that he did not participate in the actual beating, and was not present when Yacob killed Redman and hid the body. Rather, he claimed that Yacob instructed him to take Redman's car to the front of the industrial park and wait for him. Appellee explained that he complied, and approximately twenty minutes later, returned to the scene, picked up Yacob, and drove away in Redman's car, with Redman's wallet which, he said, Yacob had taken without appellee's knowledge. Appellee then recalled that, after several days with Redman's car, they picked up three hitchhikers and traveled to Atlantic City, New Jersey. Yacob's initial taped confession was consistent with appellee's account: Yacob said that appellee never touched Redman, and that during the attack he had instructed appellee to leave in Redman's car until he was done. *See* Yacob Statement, 7/10/81.

Appellee and Yacob were charged with first degree murder, robbery, theft by unlawful taking, receiving stolen property and conspiracy. The Commonwealth sought the death penalty against both defendants. On November 5, 1981, at a pre-trial hearing on appellee's motion to transfer the matter to juvenile court, the trial court, per the Honorable Isaac S. Garb, Jr., heard evidence concerning the facts of the case, including the autopsy report, appellee's taped statement and his subsequent in-court testimony. At that hearing, appellee changed his earlier account somewhat, testifying that he had never

planned to lure Redman to a secluded area to beat him, but merely joined Yacob in Redman's car because he had believed that Redman would supply them with "crank" (methamphetamine).  But, on cross-examination, appellee conceded that he had originally told police that he and Yacob had planned to find a secluded place to attack Redman.  As in his taped statement, appellee recounted that, after the attack, they had left the scene in Redman's car, with Redman's wallet, and then later drove the stolen vehicle to the New Jersey shore with three hitchhikers.  Judge Garb denied appellee's transfer motion.

At a subsequent hearing on November 24, 1981, Judge Garb considered the co-defendants' other pre-trial motions, including appellee's motion to suppress his earlier statement to police.[2]  Again, the trial court heard evidence related to the facts of the case.  The trial court granted the Commonwealth's request to incorporate the juvenile transfer hearing transcript into the hearing record.  Appellee also testified a second time, insisting again that Yacob had attacked Redman, while he had merely watched until he was instructed to take Redman's car and "go wait for [Yacob] somewhere."  The court also heard the testimony of several police officers who had arrested appellee and Yacob.  Lieutenant Robert Eckert testified that, prior to the arrest, police had interviewed several witnesses, including Andrea McGlinchey.  Lieutenant Eckert said that Ms. McGlinchey had told police that Yacob had pointed to Redman's car and boasted to her and a friend that he and appellee had "just beat up a guy to get that."  Lieutenant Eckert further testified that, after appellee and Yacob were arrested and en route to the police station, appellee volunteered, "You know the guy was a fag, don't you?"

On December 1, 1981, appellee entered a plea of guilty to general homicide for the murder of Redman, and the related charges of robbery, theft by unlawful taking, receiving stolen property and criminal conspiracy.  Judge Garb conducted a

---

2.  A motion to sever the trials of the co-defendants was granted.  All other motions were denied.

plea colloquy, with counsel present, in which he explained the theory of accomplice liability and that general homicide includes "first degree, second degree and third degree murder and voluntary and involuntary manslaughter." Judge Garb thoroughly discussed the elements of each of these offenses, as well as the offenses of robbery, theft by unlawful taking, receiving stolen property and criminal conspiracy—and the sentences that could be imposed under each. Judge Garb then informed appellee that he had the right to a trial in which the Commonwealth would bear the burden of proof, and that he did not have to plead guilty. Further, Judge Garb informed appellee that, as a result of his plea, the presumption would be that he was guilty of murder of the third degree, and that the Commonwealth would bear the burden of proof at the subsequent degree-of-guilt hearing. Throughout the colloquy, appellee repeatedly stated that he understood the charges and the consequences of entering the general plea. When the colloquy was complete, and appellee had verbally confirmed that he was entering his guilty plea knowingly and voluntarily, Judge Garb accepted the guilty plea. Neither appellee nor his counsel objected that the colloquy was deficient in any way.

The degree of guilt hearing immediately followed the guilty plea hearing. There the Commonwealth introduced additional evidence concerning the facts of the case, including extensive crime-scene evidence and new witnesses, including appellee's accomplice, Yacob. Yacob, who by this time had revised his version of events, testified that more than a week before the murder, "me and [appellee] had a plan to beat [Redman] up and take his car and, if possible, kill him." [3] Degree of Guilt Transcript, 12/2/81 at 186. Yacob described how he and appellee lured Redman to the industrial park by promising sex, and how he had pulled a knife on Redman once they got there. Yacob testified that he and appellee then taunted Redman as they passed the knife back and forth. *Id.* Eventually, Yacob said, "we both started beating up on him" and,

---

**3.** Several days earlier, Yacob pleaded guilty to first degree murder, conspiracy, robbery, theft and receiving stolen property. He received a sentence of life imprisonment and a concurrent sentence of ten to twenty years.

when Redman would not stop screaming, appellee stabbed him. According to Yacob, Redman continued to moan on the ground until appellee threw a large rock against his head, and then repeated the deed again. When it was clear that Redman was dead, Yacob recalled that, together, they dragged the body to a wooded area and hid it under a pile of trash.

Other witnesses corroborated aspects of Yacob's account. For example, fourteen year-old Tom McComeskey testified that several days before the murder he had heard appellee and Yacob "talking about how they were going to beat this guy up." Also, Miriam Frazier, one of the hitchhikers who went to the shore with appellee and Yacob in Redman's stolen vehicle, testified that when she asked about the car, appellee replied that they had "killed a guy for it." *Id.* at 93. She further testified that appellee claimed that "the guy was a fag," and bragged that he "did it all" because Yacob was too afraid. *Id.* at 94–95. Likewise, Gerald New, who had been incarcerated with appellee at the Bucks County Prison, testified that appellee had told him that he had been charged with murder and that he had beaten and stabbed his victim. New further testified that appellee said he thought his actions were justified because his victim was gay.

Upon completion of the degree of guilt hearing on December 3, 1981, Judge Garb found appellee guilty of first degree murder beyond a reasonable doubt:

> Considering the number and severity of the blows inflicted in this case to areas of the body where the blows were administered, noticeably the head, face and side, we are satisfied that these facts clearly establish the intent to kill. Considering that [appellee] inflicted many if not most of the serious injuries, together with his admissions to various people that he had done so, caused us to conclude that he had in fact formed the requisite intent to kill which would support the finding of murder in the first degree.

Trial Court slip op. at 19. At the penalty phase, Judge Garb concluded that sufficient mitigating factors were established to prevent the imposition of the death penalty. Thus, on December 18, 1981, appellee was sentenced to life imprisonment and

a concurrent sentence of ten to twenty years for the robbery conviction. No timely post-sentence motions were filed.

In October of 1982, upon petition of counsel, Judge Garb granted permission to file post-verdict motions *nunc pro tunc.* The only issue raised in the post-verdict motion was the trial court's refusal to transfer the matter to juvenile court. Judge Garb denied the post-verdict motion. The Superior Court affirmed and on March 3, 1985, this Court denied allocatur.

On May 5, 1988, appellee filed a *pro se* petition under the now-repealed Post–Conviction Hearing Act (PCHA), 19 P.S. § 1180–1, *et seq.,* alleging, *inter alia,* that trial counsel was ineffective because the "guilty plea was deficient and therefore [appellee] could not have knowingly entered it." The trial court appointed the Public Defender's Office of Bucks County to represent appellee, but counsel took no action on the petition. Appellee filed a request for new counsel on March 3, 1999—more than ten years later.[4] At that time, appellee also filed a "suggested" amendment to his pending PCHA petition, which included several new claims of counsel ineffectiveness and trial court error, including the relevant claim here, which expanded upon his original claim that the "guilty plea was deficient": *i.e.,* "the trial court erred in accepting petitioner's guilty plea; inasmuch as no factual basis was established relating admitted acts to the elements of the offenses charged, the plea was unknowing."

On June 20, 2000, after a hearing to consider appellee's "motion and supplemental motion" for post-conviction relief, the Honorable John J. Rufe appointed new counsel and granted leave for counsel to amend or supplement the original *pro se* petition.[5] On November 14, 2000, appellee filed a counseled "brief in support of post-conviction collateral relief," which expanded upon his original *pro se* petition and claimed, *inter alia,* that "trial counsel were ineffective when they failed to

4. There is no explanation in the record of the reasons for this delay.

5. The PCHA court appointed present counsel, Randall Miller, Esq., on August 3, 2000, after prior appointed counsel withdrew.

object to a guilty plea colloquy without a factual basis to substantiate any of the claims." [6]

On March 2, 2001, after an evidentiary hearing, the PCHA court granted appellee's petition for post-conviction relief, overturned his first degree murder conviction, and permitted him to withdraw his 1981 guilty plea. Concluding that appellee's initial post-conviction appointed counsel had let his PCHA petition sit idle for more than ten years without explanation or justification, the PCHA court examined the merits of the petition under the PCHA, rather than the PCRA. On the merits, the court found that appellee could not have entered the guilty plea with a full understanding of the nature of the charges because the facts underlying the offenses were not adduced on the record at the time the general guilty plea was entered. The court concluded that this was particularly important here because appellee had repeatedly denied participating in the actual beating:

> Where, as in this case, a defendant has offered an exculpatory explanation prior to the guilty plea, it should alert the judge hearing the plea to conduct an especially diligent examination of the defendant so as to assure that the plea is knowing and voluntary. Consequently, the existence of a factual basis for the plea and an application of the law, became essential to assuring a voluntary and knowing plea.

PCHA court slip op. at 14 (citation omitted). Thus, the PCHA court determined that the colloquy was defective as a matter of law for lack of a factual basis and that appellee's plea/trial counsel were ineffective for failing to object to the colloquy

---

**6.** Appellee's "brief in support of post conviction relief" raised the following issues: (a) whether trial counsel were ineffective when they failed to object that the guilty plea colloquy lacked a factual basis; (b) whether trial counsel were ineffective in failing to object during the guilty plea colloquy when the court gave a defective description of accomplice liability as it pertains to first degree murder; (c) whether trial counsel were ineffective when they failed to object to the court's description of co-conspirator liability/criminal conspiracy in relation to the various degrees of murder and the permissible sentences for conspiracy to commit murder; and (d) whether trial counsel were ineffective when they failed to interview and/or present witnesses in an attempt to mitigate appellee's involvement in the crimes during the degree of guilt hearing.

and for failing to petition the court to withdraw the plea thereafter.

A three-judge panel of the Superior Court affirmed, agreeing with the PCHA court's predicate conclusion that the plea was unknowing because the colloquy failed to set forth a factual basis for the plea. The panel reasoned that, although appellee "felt that he was guilty as an accomplice," there was "no indication in the record that [he] at any time was aware that he would be accused of conspiring to kill the victim; that he would be accused of stabbing and bludgeoning the victim; or that he would ever be accused of even touching the victim." Superior Court slip op. at 10–11.

The Commonwealth sought further review and this Court granted allocatur to consider, *inter alia,* the PCHA court's conclusion that the absence of a detailed factual basis in a colloquy preceding a general plea of guilt and degree of guilt hearing rendered appellee's plea constitutionally unsound as a matter of law, and thereby rendered counsel ineffective for failing to object.[7] Our standard of review is whether the post-conviction court's determination is supported by evidence of

---

**7.** The Commonwealth's allocatur petition raised the following issues:
   a. Whether the PCHA court erred in reversing appellee's twenty-year-old first degree murder conviction and in imposing an absurd requirement that he admit to facts that he is attempting to dispute at the degree of guilt hearing;
   b. Whether appellee is entitled to a new trial based on an inadequate colloquy to third degree murder when appellee entered the plea to avoid the death penalty and was, in fact, found guilty beyond a reasonable doubt of first degree murder by the trial court;
   c. Whether appellee waived his challenge to the validity of his guilty plea and whether the PCHA court erred in granting post-conviction collateral relief;
   d. Whether appellee failed to plead and prove by a preponderance of the evidence that he was entitled to relief when he presented no evidence to support his claims;
   e. Whether the PCHA court lacked jurisdiction to hear appellee's request for post-conviction collateral relief, specifically as to the charge for which relief was granted, as said action was untimely filed;
   f. Whether the delay in the post-conviction collateral challenge of the guilty plea has prejudiced the Commonwealth's ability to re-try appellee such that the requested relief must be denied.
Our general grant of allocatur encompassed all of these issues.

record and whether it is free of legal error. *Commonwealth v. Jermyn*, 551 Pa. 96, 709 A.2d 849, 856 (1998).

The Commonwealth argues that, in analyzing the plea, the PCHA court failed to apply the totality of the circumstances test, which is the correct standard for determining whether a guilty plea is knowing, intelligent and voluntary. Under this standard, the Commonwealth argues that the plea was knowing, intelligent and voluntary because the plea colloquy was thorough, and because appellee acknowledged that he understood the charges against him. Moreover, the Commonwealth avers that the PCHA court's conclusion that the colloquy was defective for failing to establish a factual basis ignores the crucial fact that this was not simply a guilty plea, but a general plea of guilty which was to be followed by a degree of guilt hearing. The evidence which was adduced immediately following the colloquy—and which appellee was free to contest in order to determine the degree of guilt—proved appellee's willful, deliberate and malicious murder of Redman. The Commonwealth also contends that appellee's claim that trial counsel was ineffective for failing to object to the plea colloquy was untimely under the Post Conviction Relief Act (PCRA), and its amendments, 42 Pa.C.S.A. § 9541 *et seq.*, which were enacted during the pendency of his petition.

Appellee counters that the absence of an adequate factual basis for the plea in the colloquy, and trial counsel's failure to object to the colloquy or move to withdraw the plea, led him to unknowingly admit his general guilt to crimes that he did not commit. Specifically, appellee argues that, in prior proceedings, he had expressly denied having participated in the actual killing of Redman. Appellee now avers that his plea was motivated by the fact that he felt guilty that he did not try to stop the beating or tell police about it, but he argues that he mistakenly believed that this alone was sufficient to render him responsible for the crimes.

As a preliminary matter, we consider the Commonwealth's contention that appellee's amended petition, which raised this claim, is untimely under the PCRA. The PCRA timeliness requirements are jurisdictional in nature and, accordingly, a

court cannot hear untimely PCRA petitions. *Commonwealth v. Rienzi,* 573 Pa. 503, 827 A.2d 369, 371 (2003). *See also Commonwealth v. Hall,* 565 Pa. 92, 771 A.2d 1232, 1234 (2001) ("Pennsylvania courts lack jurisdiction to entertain untimely PCRA petitions.").

The Commonwealth avers that, since appellee did not raise the issue of whether the colloquy was defective for failing to establish a factual basis for the plea in his original *pro se* petition filed under the PCHA, his 1999 "amended" petition—which raised the issue for the first time—is actually a new petition subject to the PCRA, and not an amendment to the original and pending PCHA petition.[8] Because the "amended" petition was filed more than one year after the PCRA's one-year time limitation became effective in 1996, the Commonwealth argues that this claim should be dismissed as untimely.

The 1995 amendments to the PCRA (which took effect on January 16, 1996) indeed require that all petitions be filed within one year of the date on which the judgment becomes final, or within one year of the effective date of the amendment. 42 Pa.C.S. § 9545. The PCHA, however, included no such time restriction. A post-conviction court has broad discretion in granting leave to amend a petition for post-conviction collateral relief. *See* PA.R.CRIM.P. 905(A) ("The judge may grant leave to amend or withdraw a petition for post-conviction collateral relief at any time. Amendment shall be freely allowed to achieve substantial justice."); PA.R.CRIM.P.

---

**8.** According to the docket sheet, appellee did not file an amended PCHA petition in March of 1999, but instead simply requested the appointment of counsel. The record shows, however, that appellee did submit "suggested amendments" at that time. On June 20, 2000, after a hearing to consider appellee's "motion and supplemental motion" for post conviction relief, Judge Rufe appointed new counsel and granted leave for counsel to amend or supplement the original *pro se* petition. On November 14, 2000, appellee filed a counseled "brief in support of post conviction collateral relief," which reframed appellee's allegations of trial court error as counsel ineffectiveness claims, including the instant claim: "Whether [appellee's] trial counsel were ineffective when they failed to object to a guilty plea colloquy without a factual basis to substantiate any of the claims." This is the claim that the lower courts considered. Thus, we assume that the Commonwealth is actually referring to appellee's 2000 counseled amendments, and not his 1999 *pro se* "suggested amendments."

905(B) (A "judge shall order amendment of the petition" when petition for post-conviction relief "is defective as originally filed."). Moreover, this Court has determined that, under our rules of criminal procedure, a petitioner for post-conviction relief is entitled to counsel. *See* PA.R.CRIM.P. 904(D) ("The judge shall appoint counsel to represent a defendant whenever the interests of justice require it."); *see also Commonwealth v. Williams,* 573 Pa. 613, 828 A.2d 981, 990 (2003); *Commonwealth v. Sangricco,* 490 Pa. 126, 415 A.2d 65, 68 (1980) (PCHA envisions that *pro se* petitioner will have legally trained counsel to advance position in acceptable legal terms). Accordingly, we have held that, where a petitioner files his first post conviction relief petition *pro se,* he shall be permitted to file an amended petition with the assistance of counsel. *See Commonwealth v. Tedford,* 566 Pa. 457, 781 A.2d 1167, 1170 (2001); *Commonwealth v. Priovolos,* 552 Pa. 364, 715 A.2d 420 (1998); *Commonwealth v. Duffey,* 551 Pa. 675, 713 A.2d 63 (1998).

The PCHA petition here was neither withdrawn nor decided prior to being amended. In accordance with our precedent, the PCHA court *sub judice* granted leave for appellee to "amend or supplement" his *pro se* petition with the assistance of counsel. Thus, because the counseled petition was a permitted amendment to the original and pending *pro se* petition, and nothing in the PCHA existed to prohibit or restrict the amendment, it must be viewed as an extension of the existing *pro se* petition, rather than as a new and distinct petition, subject to the intervening requirements of the PCRA, including its time restriction. *See Tedford,* 781 A.2d at 1170 n. 6 ("[A]n amended petition is merely an extension of an existing petition rather than a new and distinct petition.").[9] Accordingly, the PCHA court did not err in considering appellee's counseled, amended petition as timely. *See Williams,* 828 A.2d at 989 (because rules require counsel to file amended

---

**9.** Notably, nothing in the PCRA or its subsequent amendments suggested that it applied to petitions already pending under the PCHA. To the contrary, the PCRA as originally enacted stated that it applied to petitions filed on or after the effective date of the act. *See* Section 6 of Act 1988, April 13, P.L. 336, No. 47.

petition, counseled amendment to timely *pro se* petition is timely, though filed after one-year deadline).[10]

To be eligible for relief under the PCHA, a petitioner must prove, *inter alia:* "That the error resulting in his conviction and sentence has not been waived." 19 P.S. § 1180–3(d) (repealed). Furthermore, Section 4(b) of the PCHA provides:

For purposes of this act, an issue is waived if:

(1) The petitioner knowingly and understandingly failed to raise it and it could have been raised before the trial, at the trial, on appeal, in a habeas corpus proceeding actually conducted, or in a prior proceeding actually initiated under this act; and

(2) The petitioner is unable to prove the existence of extraordinary circumstances to justify his failure to raise the issue.

19 P.S. § 1180–4(b) (repealed). Finally, Section 4(c) of the PCHA provides that "there is a rebuttable presumption that a failure to appeal or to raise an issue is a knowing and understanding failure." 19 P.S. § 1180–4(c) (repealed). Since the validity of appellee's plea was cognizable on direct appeal, *see Commonwealth v. Greer,* 457 Pa. 646, 326 A.2d 338 (1974); *Commonwealth v. Hill,* 457 Pa. 1, 319 A.2d 886 (1974), any issue concerning the plea itself was waived and could not be raised under the PCHA unless appellee either rebutted the presumption that the failure to raise the issue was knowing

10. The Commonwealth cites *Commonwealth v. Chester,* 557 Pa. 358, 733 A.2d 1242 (1999), for the proposition that the PCRA applies when an amendment to a post-conviction petition is filed after the effective date of the PCRA. The Commonwealth's reliance on *Chester* is misplaced. In that case, this Court concluded that the 1995 amendments to the PCRA applied even though the petitioner had originally filed a *pro se* petition requesting an evidentiary hearing in June of 1995, before the PCRA amendments took effect. There, however, petitioner had received leave of court to withdraw the original *pro se* petition and incorporate the allegations into a new post-conviction petition. In April of 1996, petitioner filed a counseled PCRA petition. In concluding that the amended PCRA applied, this Court noted that the petition was filed well after the date the amended PCRA became effective. Here, appellee never withdrew his original PCHA petition, but rather, was permitted to amend his PCHA petition. Moreover, the docket clearly records that appellee's original PCHA petition was filed in 1988—well before the PCRA became effective.

and understanding or alleged and proved the existence of an extraordinary circumstance justifying the failure to raise the issue.

Appellee argued before the PCHA court that the validity of his guilty plea was not waived because ineffective assistance of counsel was an extraordinary circumstance justifying his failure to challenge the validity of the plea on direct appeal. Ineffective assistance of counsel was recognized as an extraordinary circumstance under the PCHA. *See Commonwealth v. Wideman,* 453 Pa. 119, 306 A.2d 894, 896 (1973). To prevail on a claim that counsel was ineffective, appellee must overcome the presumption of attorney competence by showing that: (1) his underlying claim is of arguable merit; (2) the particular course of conduct pursued by counsel did not have some reasonable basis designed to effectuate his interests; and (3) but for counsel's ineffectiveness, there is a reasonable probability that the outcome of the challenged proceeding would have been different. *Commonwealth v. (Michael) Pierce,* 567 Pa. 186, 786 A.2d 203, 213 (2001); *accord Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).[11] Allegations of ineffectiveness in connection with the entry of a guilty plea will serve as a basis for relief only if the ineffectiveness caused the defendant to enter an unknowing or involuntary plea. *Commonwealth v. Fears,* 575 Pa. 281, 836 A.2d 52, 64 (2003); *Commonwealth v. Frometa,* 520 Pa. 552, 555 A.2d 92, 93 (1989); *Commonwealth v. Jones,* 477 Pa. 266, 383 A.2d 926 (1978).

Because a guilty plea is an admission of guilt and a waiver of several constitutional rights—including the right to trial by jury and the right against self-incrimination—it will be consid-

11. We recognize that the conduct of trial counsel is governed by the standards existing when the case was tried in 1981, which was before *Strickland* was decided and before this Court decided *Commonwealth v. (Charles) Pierce,* 515 Pa. 153, 527 A.2d 973 (1987), which followed *Strickland* as a matter of Pennsylvania law. The leading case in this jurisdiction in 1981 was *Commonwealth ex rel. Washington v. Maroney,* 427 Pa. 599, 235 A.2d 349 (1967). Nevertheless, the parties do not assert that the governing standard was materially different at the time appellee entered his guilty plea. Accordingly, we will evaluate the claim of ineffectiveness in light of our existing standard.

ered knowing, intelligent and voluntary under the Due Process Clause only if it constitutes " 'an intentional relinquishment or abandonment of a known right or privilege.' " *Boykin v. Alabama*, 395 U.S. 238, 243 n. 5, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938)). A plea is knowing, intelligent and voluntary under this standard if the defendant had an understanding of the nature of the charges against him, his right to a jury trial and the consequences of his plea. *See Boykin*, 395 U.S. at 243–244, 89 S.Ct. 1709; *see also Commonwealth v. Hines*, 496 Pa. 555, 437 A.2d 1180, 1182 (1981). Further, unless a defendant has an understanding of the charges against him, the plea cannot stand as an intelligent admission of guilt. *Henderson v. Morgan*, 426 U.S. 637, 645 n. 13, 96 S.Ct. 2253, 49 L.Ed.2d 108 (1976). Finally, for a defendant to understand the charges against him, he must possess " 'an understanding of the law in relation to the facts.' " *Boykin*, 395 U.S. at 243 n. 5, 89 S.Ct. 1709 (quoting *McCarthy v. United States*, 394 U.S. 459, 89 S.Ct. 1166, 22 L.Ed.2d 418 (1969)); *see also Henderson*, 426 U.S. at 645, 96 S.Ct. 2253 (plea cannot be knowing and voluntary unless defendant received "real notice of the true nature of the charge against him, the first and most universally recognized requirement of due process.").

Although a plea colloquy is not constitutionally mandated, it is a means by which the trial court may make the constitutionally required determination that a defendant's guilty plea is truly knowing and voluntary. *Commonwealth v. Maddox*, 450 Pa. 406, 300 A.2d 503, 504 (1973) (citing *McCarthy*, 394 U.S. at 465, 89 S.Ct. 1166). In *Commonwealth ex rel. West v. Rundle*, 428 Pa. 102, 237 A.2d 196 (1968), this Court discussed the merit in requiring a trial court to conduct a colloquy before accepting a guilty plea:

A majority of criminal convictions are obtained after a plea of guilty. If these convictions are to be insulated from attack, the trial court is best advised to conduct an on the record examination of the defendant which should include, *inter alia*, an attempt to satisfy itself that the defendant

understands the nature of the charges, his right to a jury trial, the acts sufficient to constitute the offenses for which he is charged and the permissible range of sentences. *Id.* at 197–198. Such a colloquy serves the additional purpose of creating a complete record at the time the plea is entered, upon which a reviewing court may determine whether the plea was entered knowingly and voluntarily. Indeed, our Rules of Criminal Procedure now require a trial court to conduct a colloquy on the record before accepting a guilty plea. *See* PA.R.CRIM.P. 590.

In determining whether a guilty plea was entered knowingly and voluntarily, however, a court "is free to consider the totality of the circumstances surrounding the plea." *Fears,* 836 A.2d at 64 (quoting *Commonwealth v. Allen,* 557 Pa. 135, 732 A.2d 582, 588–89 (1999)); *see also Commonwealth v. Schultz,* 505 Pa. 188, 477 A.2d 1328, 1330 (1984) (in determining whether guilty plea has been voluntarily, knowingly and intelligently entered, courts look to totality of circumstances surrounding plea); *Commonwealth v. Martinez,* 499 Pa. 417, 453 A.2d 940 (1982) (same); *Commonwealth v. Shaffer,* 498 Pa. 342, 446 A.2d 591 (1982) (same). A court may consider a wide array of relevant evidence under this standard including, but not limited to, transcripts from other proceedings, off-the-record communications with counsel, and written plea agreements. *Fears,* 836 A.2d at 64.

In concluding that the guilty plea *sub judice* was unknowing, the PCHA court erroneously relied upon this Court's decision in *Hines,* 496 Pa. 555, 437 A.2d 1180. In *Hines,* we stated that "a colloquy with the defendant must demonstrate that there is a factual basis for the plea and that the defendant understands the nature and elements of the offense charged." *Id.* at 1182. There, as here, the defendant pleaded guilty to murder generally, after which the trial court conducted a degree-of-guilt hearing and found him guilty of murder of the first degree. On PCHA review, however, this Court concluded that the plea was invalid because the colloquy failed to establish a factual basis for the plea. We noted that the trial court had "not even asked the threshold question of whether

he had killed the victim." *Id.* at 1183. Significantly, in *Hines* the problems surrounding the trial court's acceptance of the guilty plea extended well beyond its failure to engage in a colloquy that elicited the defendant's explicit admission that he shot his victim. Rather, the colloquy there utterly failed even to explain to the defendant the nature of the charges against him, his right to a jury trial, or the consequences of entering a guilty plea. Indeed, this Court noted that the colloquy "did no more than inform appellant of the name of the crime after he had pled guilty." *Id.* at 1183. We further noted that the defendant had, on the record, denied killing his victim prior to entering the guilty plea, and that he asked to withdraw the plea shortly after it was entered. Under those circumstances, we concluded that there was no factual basis upon which to conclude that the defendant had understood either the charges to which he had pled or the consequences of his plea. Accordingly, we vacated the guilty plea.

This Court's decision in *Hines* followed a point of view first espoused in *Commonwealth v. Ingram*, 455 Pa. 198, 316 A.2d 77 (1974), where this Court held that, to help ensure that the defendant understands the nature of the charges to which he is pleading guilty, a trial court must conduct an on-the-record examination of the defendant as outlined in the comments to PA.R.CRIM.P. 319(a) (now Rule 590(a)). Rule 590(a) sets forth the procedure governing pleas and plea agreements, and provides that a trial court "shall not accept [a plea] unless the judge determines after inquiry of the defendant that the plea is voluntarily and understandingly tendered." PA.R.CRIM.P. 590(a).[12] The comments to the Rule recommend that "at a

**12.** Rule 590(a) provides as follows:

(1) Pleas shall be taken in open court.

(2) A defendant may plead not guilty, guilty, or, with the consent of the judge, *nolo contendere*. If the defendant refuses to plead, the judge shall enter a plea of not guilty on the defendant's behalf.

(3) The judge may refuse to accept a plea of guilty or *nolo contendere*, and shall not accept it unless the judge determines after inquiry of the defendant that the plea is voluntarily and understandingly tendered. Such inquiry shall appear on the record.

PA. R.CRIM P. 590(a).

minimum" the judge should ask questions to elicit the following information:

(1) Does the defendant understand the nature of the charges to which he or she is pleading guilty or *nolo contedere?*

(2) **Is there a factual basis for the plea?**

(3) Does the defendant understand that he or she has the right to trial by jury?

(4) Does the defendant understand that he or she is presumed innocent until he is found guilty?

(5) Is the defendant aware of the permissible range of sentences and/or fines for the offenses charged?

(6) Is the defendant aware that the judge is not bound by the terms of any plea agreement tendered unless the judge accepts such agreement?

PA. R.CRIM. P. 590 Comments (emphasis added).[13] In a line of subsequent decisions, this Court cited *Ingram* to support the proposition that these areas of inquiry are "mandatory during a guilty plea colloquy and the failure to satisfy these minimal requirements will result in reversal." *Commonwealth v. Willis*, 471 Pa. 50, 369 A.2d 1189, 1190 (1977) (reversing judgment of sentence where record plea colloquy did not inform defendant of presumption of innocence); *see also Commonwealth v. Chumley*, 482 Pa. 626, 394 A.2d 497, 501 (1978) ("Failure to inquire into defendant's understanding of these subjects generally requires reversal."); *Commonwealth v. Tabb*, 477 Pa. 115, 383 A.2d 849, 852 (1978) ("Absent such a dialogue on the record, we cannot conclude that the plea was entered voluntarily, intelligently, knowingly, and understandingly ... and a judgment of sentence cannot stand on such a plea."); *Commonwealth v. Morin*, 477 Pa. 80, 383 A.2d 832 (1978) (reversal and remand for new trial only remedy in case of inadequate colloquy); *Commonwealth v. Dilbeck*, 466 Pa. 543, 353 A.2d 824 (1976) (same); *Commonwealth v. Schork*, 467 Pa. 248, 356

---

13. The language of the Comment to the current Rule is essentially the same as the language quoted in *Ingram.*

A.2d 355 (1976) (same); *Commonwealth v. Minor*, 467 Pa. 230, 356 A.2d 346 (1976) (same).

But, both the PCHA court and the Superior Court *sub judice* failed to recognize that this Court has long since abandoned the *per se* approach suggested in *Ingram* and its progeny. *See Schultz*, 477 A.2d at 1330 ("The *per se* approach of *Ingram* . . . has been abrogated by subsequent decisions of this Court."); *Shaffer*, 498 Pa. 342, 446 A.2d 591; *accord Commonwealth v. Anthony*, 504 Pa. 551, 475 A.2d 1303 (1984); *Commonwealth v. Carson*, 503 Pa. 369, 469 A.2d 599 (1983); *Commonwealth v. Smith*, 498 Pa. 661, 450 A.2d 973 (1982). Indeed, even before this Court expressly abandoned *Ingram's per se* approach, there was competing authority to suggest that that decision did not necessarily require reversal whenever a plea colloquy was deemed to be defective, so long as there was sufficient indication in the record that the plea was knowing and voluntary. *See Commonwealth v. Johnson*, 460 Pa. 169, 331 A.2d 473, 477 (1975) ("[T]he omission of any particular question [recommended in the comment to now-Rule 590] will not necessarily invalidate the guilty plea so long as there exists sufficient indication that the defendant did plead knowingly and voluntarily."); *Commonwealth v. Nelson*, 455 Pa. 461, 317 A.2d 228, 229 (1974) (failure of court to elicit from accused the factual basis for guilty plea "is not sufficient to invalidate the plea, if during the plea proceedings the facts of the crime and the factual basis for the plea are placed on the record in the presence of the accused and the court."). Thus, a guilty plea is not automatically suspect simply because the plea colloquy failed to cover one of the specific areas of inquiry recommended in the comments to Rule 590. Rather, a court should consider whether the totality of the circumstances surrounding the plea establish that it was entered knowingly and voluntarily.

An example of the totality of the circumstances approach in the context of an ineffective assistance of counsel claim may be found in *Commonwealth v. Gardner*, 499 Pa. 263, 452 A.2d 1346 (1982). In *Gardner*, this Court examined not only the oral and written plea colloquy, but also off-the-record commu-

nications between the defendant and counsel in order to determine whether, prior to the entry of his guilty plea to murder, the defendant was informed of his right to participate in the selection of a jury chosen from the community. The defendant had not been so informed on the record, but at the evidentiary hearing on the PCHA petition, trial counsel explained that he had not objected to the guilty plea colloquy because, prior to the colloquy, he had twice informed the defendant of his right to a jury trial even though it was not mentioned by the trial court on the record. The Court concluded that counsel was not ineffective in failing to object to the colloquy. *See also Smith*, 498 Pa. 661, 450 A.2d 973 (on direct appeal, notwithstanding that record colloquy omitted explanation of requirement of jury unanimity and defendant's right to participate in jury selection, written form signed by defendant included neglected requirements and cured otherwise defective colloquy).

Cases like *Gardner* suggest the importance of the contemporaneous objection requirement and the effect the absence of such an objection has when a challenge is later forwarded as a claim of counsel ineffectiveness. If a colloquy indeed is deficient, and the client is not otherwise aware of the point which has not been covered adequately, it is incumbent upon plea counsel to object. Where, as in this case, there was no such objection, the question of the validity of the plea should not be confined to the trial record; rather, it must also include counsel's non-record communications with his client, if any. In other words, where the colloquy has not been objected to at a time when the defect may be cured, the defect should not automatically serve as the hyper-technical basis for collateral relief.

Inquiry into the factual basis for a guilty plea obviously serves important functions. The facts make it easier for the defendant to understand the nature of the offense to which he is pleading guilty. In addition, the inquiry provides the court with a better assessment of the defendant's competency and willingness to plead guilty. It also provides a more adequate record and thus minimizes the likelihood that the plea will be

set aside later. *See* 5 WAYNE LAFAVE ET AL., CRIMINAL PROCE-
DURE, § 21.4(f) (2d. ed. 1999). However, in *North Carolina v.
Alford*, 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970), the
U.S. Supreme Court acknowledged that a knowing and volun-
tary guilty plea does not require that the defendant admit to
every act:

> [W]hile most pleas of guilty consist of both a waiver of trial
> and an express admission of guilt, the latter element is not a
> constitutional requisite to the imposition of criminal penalty.
> An individual accused of crime may voluntarily, knowingly,
> and understandingly consent to the imposition of a prison
> sentence even if he is unwilling or unable to admit his
> participation in the acts constituting the crime.

*Id.* at 37, 91 S.Ct. 160. A defendant is particularly unlikely to
admit his participation in every act constituting the crime
where, as here, he enters a plea to murder generally, and
intends to contest the degree of murder at a subsequent
hearing, where the Commonwealth will bear the burden of
proof. Thus, a defendant's unwillingness to admit to certain
acts does not necessarily lead to the conclusion that his guilty
plea is unknowing as a general matter; and it should not lead
to such an automatic conclusion where the general plea will be
followed by a contested degree of guilt hearing.

In light of the totality of the circumstances surrounding the
plea in this case, it is clear that there was a sufficient factual
basis for this general plea to be deemed knowingly and
voluntarily entered. As detailed above, the trial court heard
evidence concerning the facts of the case at two pre-trial
proceedings at which appellee was present. The evidence
included Redman's autopsy report and the taped statements of
both Yacob and appellee. Yacob's taped confession recounted
how he and appellee lured Redman to the deserted industrial
park, and how Yacob killed Redman. In appellee's taped
statement he explained that he and Yacob had planned to
bring the victim to a secluded area and "beat him up."
Although appellee's subsequent testimony denied any knowl-
edge of, or participation in, the actual killing of the victim, he
consistently admitted that he was with Yacob and the victim

when they arrived at the scene of the murder, and that he left the scene with Yacob in the victim's vehicle with the victim's wallet. On the basis of this record, which suggests that appellee, at the very least, knowingly aided Yacob in the commission of the crimes, there was an adequate factual basis to conclude that appellee's conduct fell within the charges to which he was pleading, *i.e.*, murder generally (with a presumption that it was murder of the third degree), robbery and conspiracy.[14]

Further, the evidence adduced at the pre-trial proceedings and the plea colloquy support the conclusion that appellee was well aware of the factual basis for the charges against him. At the outset of the colloquy, the prosecutor informed the trial court that appellee had agreed to plead guilty to murder generally, and to robbery and conspiracy, and that appellee and his counsel had "endorsed" the bills of information describing the charges against him.[15]   Also, the trial court

14. The Crimes Code provides that: "A person is guilty of an offense if it is committed by his own conduct or by the conduct of another person for which he is legally accountable, or both." 18 Pa.C.S.A. § 306(a). The Code further provides that: "A person is legally accountable for the conduct of another person when [ ] he is an accomplice of such other person in the commission of the offense," *id.* § 306(b), and, "[a] person is an accomplice ... if ... with the intent of promoting or facilitating the commission of the offense, he aids or agrees or attempts to aid such other person in planning or committing it...." *Id.* § 306(c).

15. The bills of information, which appellee and his counsel "endorsed," alleged the following:

   The District Attorney of Bucks County by this information charges that, on or about the First day of July 1981 in said County, one DENNIS FLANAGAN,
   (1) FIRST DEGREE MURDER did, intentionally kill one, James Redman,
   (2) SECOND DEGREE MURDER did, cause the death of one James Redman, while being engaged in the perpetration of a felony, to wit, Robbery

   * * *

   The District Attorney of Bucks County by this information charges that, on or about the First day of July 1981 in said County, one DENNIS FLANAGAN,
   (1) ROBBERY
   did, in the course of committing a theft, inflict serious bodily injury upon one James Redman,
   (2) ROBBERY

referred to the fact that some of the evidence had been considered at prior proceedings, and informed appellee that, because he and Yacob had acted together, the theory of accomplice liability was relevant to his plea:

THE COURT: Now, in order to be certain that you understand what you are doing, and by that I mean to be certain

did, in the course of committing a theft, threaten one James Redman or intentionally put him in fear of immediate serious bodily injury,

(3) ROBBERY

did, in the course of committing a theft, commit or threaten immediately to commit any felony in the first or second degree, to wit, Criminal Homicide,

(4) ROBBERY

in the course of committing a theft, inflict bodily injury upon one James Redman, or intentionally put one James Redman in fear of immediate bodily injury,

(5) ROBBERY

in the course of committing a theft, physically take or remove property, to wit, a 1977 Oldsmobile 98 and other personal effects, from the person of James Redman by force,

(6) THEFT BY UNLAWFUL TAKING OR DISPOSITION

did, unlawfully take moveable property, to wit, a 1977 Oldsmobile 98 and other personal effects, of one James Redman, with intent to deprive him thereof,

\* \* \*

(7) RECEIVING STOLEN PROPERTY

did, intentionally receive, retain or dispose of movable property, to wit, a 1977 Oldsmobile 98 and other personal effects, of one James Redman, knowing that it has been stolen or believe that it had probably been stolen, the property not being received, retained or disposed of with intent to restore it to the owner,

(8) CONSPIRACY

did, conspire and agree with George Yacob, to commit unlawful acts, to wit, First Degree Murder,

(9) CONSPIRACY

did, conspire and agree with George Yacob, to commit unlawful acts, to wit, Second Degree Murder,

(10) CONSPIRACY

did, conspire and agree with George Yacob, to commit unlawful acts, to wit, Robbery,

(11) CONSPIRACY

did, conspire and agree with George Yacob, to commit unlawful acts, to wit, Theft By Unlawful Taking or Disposition,

(12) CONSPIRACY

did, conspire and agree with George Yacob, to commit unlawful acts, to wit, Receiving Stolen Property,

all of which is against the Act of Assembly and the peace and dignity of the Commonwealth of Pennsylvania.

that you understand the nature of these charges to which you are entering these pleas of guilty, to be sure you understand what the sentences can be, what sentences can be imposed as a result of this, and in order to be certain that you understand what the effect, legal effects are to the entry of a plea of guilty and to understand what you are waiving, that is what rights you are giving up, I am going to ask you a series of questions and give you the opportunity to answer them. I want to satisfy myself that you understand these questions and understand the import of what we are talking about. All right?

MR. FLANAGAN: Yes, sir.

THE COURT: Now, of course, as you can understand, I have presided over a number of proceedings involving this case, involving these charges against you and the charges against George Yacob, and so as you can well appreciate, I have some familiarity with the facts of these cases. I haven't heard all the evidence, of course, but I have heard some of it. Do you understand?

MR. FLANAGAN: Yes.

THE COURT: So in order to begin and in view of the fact that both you and Mr. Yacob are jointly involved or at least jointly charged with these various crimes, let me begin by explaining to you the law of accomplice, because that will sort of tie things together here, I think, and make it easier for you to understand how these charges came out. Okay?

MR. FLANAGAN: Yes, sir . . . .

Guilty Plea Transcript, 12/1/81 at 3–4. Thus, throughout the pre-trial proceedings and the plea colloquy, appellee was clearly aware that he was charged with crimes arising from his role in conspiring with Yacob in the murder of Redman. Appellee's claim prior to his plea that he did not participate in the actual beating of Redman, if accepted as the truth, would not excuse his conduct in aiding and abetting Yacob in the commission of the murder and robbery, and thus did not raise questions as to whether the plea was knowing and voluntary.

To require more than was presented here would be unrealistic given the very nature of the general plea of guilty.

Appellee's plea did not commit him to the Commonwealth's version of events: he was free to contest it, as he did, at the degree of guilt hearing. To require the Commonwealth to outline its theory of the case at the general plea stage is pointless where, as here, the defendant intended to contest that version.

Given the totality of these circumstances, we are not persuaded that trial counsel was ineffective in failing to petition to withdraw the plea on the basis that the colloquy did not establish a factual basis sufficient to permit a knowing and voluntary plea. Indeed, in reviewing the entire record, it is clear that there was an adequate factual basis for the general plea and that appellee was present at all stages of the proceedings where these facts were entered into the record.

The Majority asserts that we have ignored the issue concerning appellee's on-the-record affirmation of a "materially erroneous understanding of applicable law." In forwarding this critique, the Majority overlooks the procedural posture of this appeal. The sole substantive issue decided below, accepted for review and briefed here is whether there was an inadequate factual basis for the general plea of guilt so as to render the plea constitutionally unsound as a matter of law, and thereby render counsel ineffective for failing to object. The distinct claim alleging a defective description of accomplice liability, which the Majority raises and would summarily decide, was raised in appellee's amended PCHA petition, *see supra* n. 6, but was not reached by the court below given the disposition of the factual basis claim. We should not now *sua sponte* prejudge the question, which appellee would have been free to pursue upon remand. While it may seem clear to the Majority, in the absence of adversarial presentations on the point, that the offense description was defective, which thereby automatically rendered the general plea unconstitutionally deficient, and rendered counsel ineffective, such might not be the conclusion if the parties had actually argued the point.[16]

16. In this regard, we note that the law on accomplice liability in Pennsylvania was in a state of flux up until the mid–1990s. *See e.g.,*

The Majority's suggestion that a court does not apply a "true" totality assessment unless it *sua sponte* reaches out to decide distinct claims not raised or briefed on appeal vastly overstates the scope of the standard. The totality assessment is the general standard by which a court reviews the specific challenge presented. There may be any number of distinct challenges that could be forwarded on a specific issue. However, the standard of review is not an invitation for a court to ignore the posture of the appeal and reach out to decide all other possible issues that may arise from a colloquy. We should not rule upon the propriety of the colloquy below as against any and all possible challenges: we should simply decide the only issue arising from the colloquy that was decided below and is properly before us now.

The Majority furthers its flawed analysis by ignoring appellee's failure to satisfy his burden to prove prejudice under *Strickland/Pierce*. As the U.S. Supreme Court recently held in *United States v. Benitez*, 542 U.S. ——, 124 S.Ct. 2333, 159 L.Ed.2d 157, 2004 WL 1300161 (U.S.2004), where the burden of demonstrating prejudice is on the defendant, he may not withdraw his plea absent a showing of a reasonable probability that, "but for the error, he would not have entered the plea." *Id.* at ——, 124 S.Ct. at 2336, 159 L.Ed.2d at ——, 2004 WL 1300161, at *5. There, the U.S. Supreme Court reversed the Ninth Circuit's decision permitting the defendant in a criminal prosecution to withdraw his guilty plea based upon an unpreserved claim that the trial court's plea colloquy was deficient under the Federal Rules of Criminal Procedure. *See* FED. R.CRIM.P. 11(C)(3)(b). At issue was the plain error standard in FED.R.CRIM.P. 52. In reversing the Ninth Circuit's grant of relief, the High Court noted the rationale for placing a stricter burden of proof on a defendant challenging his guilty plea after the fact:

*Commonwealth v. Chester,* 557 Pa. 358, 733 A.2d 1242, 1253 n. 12 (1999) (*Chester II*); *Commonwealth v. Thompson,* 543 Pa. 634, 674 A.2d 217, 222–23 (1996); *Commonwealth v. Huffman,* 536 Pa. 196, 638 A.2d 961, 962–63 (1994); *Commonwealth v. Chester,* 526 Pa. 578, 587 A.2d 1367, 1384 (1991) (*Chester I*); *Commonwealth v. Bachert,* 499 Pa. 398, 453 A.2d 931 (1982).

First, the standard should enforce the policies ... to encourage timely objections and reduce wasteful reversals by demanding strenuous exertion to get relief for unpreserved error. Second, it should respect the particular importance of the finality of guilty pleas, which usually rests, after all, on a defendant's profession of guilt in open court, and are indispensable in the operation of the modern criminal justice system.

*Benitez*, 542 U.S. at ——, 124 S.Ct. at 2335, 2004 WL 1300161, at *5.

The concerns articulated by the U.S. Supreme Court in the *Benitez* plain error context are no less present here. The prejudice standard for counsel ineffectiveness—reasonable probability that the outcome would differ—is the same as *Benitez's* plain error standard. *Id.* at ——, 124 S.Ct. at 2339, (noting that plain error prejudice standard was adopted from *Strickland*). Moreover, as in *Benitez,* insistence upon such a showing is particularly salutary when a defendant seeks to challenge a guilty plea on the basis of an unpreserved claim that the plea colloquy was deficient—especially when the claim is raised decades later. Notably, appellee here did not testify at the PCHA hearing and claim that, in fact, he was unaware of the factual basis—or the legal basis—for his general plea of guilt, much less that that was the reason he actually entered his plea. Instead, he confined his complaint to attacking the record. The Majority's conclusion that, under the totality of these circumstances, appellee would not have entered the plea is rank speculation. And, it is rank speculation which reverses both the presumption of effectiveness and the burden of proof required under *Strickland.*

The courts below erred in upsetting this plea without considering the totality of the circumstances surrounding it. The reliance below upon the *per se* approach suggested in *Ingram/Hines* was misplaced—particularly given that the challenge to the plea here sounds in counsel ineffectiveness. Accordingly, I dissent.

Chief Justice CAPPY and Justice EAKIN join this dissenting opinion.